# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-1697/02-1843

_____

| | | |
|---|---|---|
| Cortland F. Langdon; Jean M. Langdon; Bemidji Distributing Co., Inc., | * * * * | |
| Appellants, | * * | |
| | * | Appeals from a decision of the |
| v. | * | United States Tax Court. |
| | * | |
| Commissioner of Internal Revenue, | * | [UNPUBLISHED] |
| | * | |
| Appellee. | * | |

_____

Submitted: December 12, 2002

Filed: February 14, 2003

_____

Before WOLLMAN, LAY, and MAGILL, Circuit Judges.

_____

PER CURIAM.

### I.

Cortland Langdon owned and operated Bemidji Distributing Company, Inc. (BDC). BDC is a wholesale beer distributorship. By 1990, BDC had grown to be the largest wholesale beer distributor in northern Minnesota. Later that year, Langdon began exploring the idea of selling BDC. He obtained Pohle Partners, a consulting firm that specializes in the sale of beer distributorships, to value BDC and help broker

the sale. Pohle Partners valued BDC's tangible assets at $765,000 and its intangible assets, such as goodwill, franchise rights, and customer lists, at $1.2 million.

In 1992, Langdon sold BDC to Bravo Beverage, Ltd. for $2,017,461. The parties allocated the purchase price to be:

- $200,000 for a two-year consulting agreement;
- $1,000,000 for a five-year covenant not to compete;
- $817,461 for BDC's operating assets and accounts receivable.

The parties did not allocate any value of the purchase price to BDC's intangible assets.

On February 4, 1999, the Commissioner of Internal Revenue determined that Langdon and BDC had a deficiency in their income taxes for the 1992 tax year. Langdon and BDC challenged the Commissioner's determination and filed an action in the United States Tax Court.[1] The tax court ruled that Langdon's covenant not to compete with Bravo was not worth $1 million. The bulk of the $1 million covenant, according to the tax court, acted as a disguised payment for BDC's intangible assets. The tax court thus reduced the value of the covenant to $334,000. The remaining $666,000 constituted value for BDC's intangible assets. This meant that BDC and Langdon needed to pay additional income taxes. Langdon and BDC appeal.

We now must decide whether the tax court properly reduced the value of Langdon's covenant not to compete. We affirm.

---

[1]The two cases were consolidated for trial and for this appeal. The Honorable Carolyn Miller Parr presided during the trial.

II.

When one corporation buys the assets of another, the parties may agree to allocate the purchase price among the assets being acquired. The Internal Revenue Service, however, is not bound by the parties' allocation agreement. 26 U.S.C. § 1060(a). The Commissioner can review the allocation agreement and set new values if the allocation is not appropriate. Id.

When reviewing the parties' allocation agreement, two different standards apply. The tax court will give deference to the parties when they have competing tax interests. If, on the other hand, the parties do not have adverse tax interests, the tax court will strictly scrutinize the allocation agreement. Lorvic Holdings, Inc. v. Commissioner, No. 3408-97, 15611-97, 1998 WL 437287 (U.S. Tax Ct. August 4, 1998). Courts use a higher standard in such cases because competing tax interests deter allocations which lack economic reality. Id.

To determine whether the parties have correctly valued a covenant not to compete, courts must look to see if the allocation is grounded in economic reality. See Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987). This means that the value of the covenant must be such that a reasonable person might bargain for it. Schultz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961). Courts have consistently applied a nine-factor test to evaluate whether a covenant not to compete lacks economic reality. The nine factors are:

> [1] The seller's (i.e., the covenantor's) ability to compete; [2] the seller's intent to compete; [3] the seller's economic resources; [4] the potential damage to the buyer posed by the seller's competition; [5] the seller's business expertise in the industry; [6] the seller's contacts and relationships with customers, suppliers, and others in the business; [7] the buyer's interest in eliminating competition; [8] the duration and

geographic scope of the covenant, [9] and the seller's intention to remain in the same geographic area.

Lorvic Holdings, 1998 WL 437287.

In the present case, we find that the tax court did not error by reducing the value of the covenant not to compete. The tax court correctly applied strict scrutiny to the transaction because the parties did not have competing tax interests. Both parties stood to benefit by allocating $1 million to the covenant. Langdon would only pay income taxes on the amount of the covenant while Bravo could amortize the covenant over its useful life. See O'Dell & Co. v. Commissioner, 61 T.C. 461, 466 (1974) (noting that a covenant not to compete may be amortized over its useful life). The tax court thus appropriately viewed this allocation with strict scrutiny.

The tax court also correctly found that it was unreasonable for the parties not to allocate money for BDC's intangible assets. BDC was an established and profitable wholesale beer distribution business. Bravo stepped into BDC's shoes at the time of the sale and acquired BDC's customer lists and exclusive brand and distribution rights. In fact, Pohle Partners listed these intangible assets in the sales materials for BDC. It is thus reasonable to conclude that Langdon and BDC transferred goodwill and going concern to Bravo. The parties appear to have disguised these intangible assets in the price of the covenant so as to avoid paying additional taxes.

Accordingly, the tax court appropriately concluded the covenant was not worth $1 million. We agree with the tax court's nine-factor analysis. We find it unreasonable to think that Bravo would lose $1 million if Langdon were to compete against it. As noted above, Bravo acquired the leading beer distribution company in northern Minnesota. It gained BDC's employees, products, customer lists, and goodwill. While it is true that Langdon could have started a new beer distribution

company or bought an existing distribution business, it is highly unlikely that he would go through such efforts to compete against Bravo–especially since he had a $200,000 consulting agreement with the company.

We thus adopt the tax court's revised valuation of the covenant. The tax court found that the covenant should be priced at $334,000. We are not at liberty to change this valuation absent clear error. The tax court's valuation will be upheld so long as "it is within the range of figures that properly can be deduced from the evidence." Hamm v. Commissioner, 325 F.2d 934, 939-40 (8th Cir. 1963); see also Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976). BDC and Langdon have not convinced us that the tax court's calculation was incorrect.

BDC and Langdon claim that International Multifoods Corp. v. Commissioner, 108 T.C. 25 (1997) and Buffalo Tools & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980) preclude the tax court from changing the value of Langdon's covenant not to compete. Those cases, however, are distinguishable from the present case. In those cases, the courts upheld the value of the covenant because the parties' tax interests were adverse. Here, as noted, Langdon and Bravo did not have competing tax interests. Thus, their allocation gets strict scrutiny and will be upheld only if they can prove the covenant is grounded in economic reality. The parties have not produced any evidence showing the covenant is worth $1 million.

The United States Tax Court is AFFIRMED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-5-